IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KIANN K. M.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 19-cv-675-RJD[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER**

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for DIB in March 2016, alleging an onset date of May 1, 2013 (Tr. 176). After holding an evidentiary hearing, ALJ Katherine Jenklin denied the application in August 2018 (Tr. 30). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final and subject to judicial review (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely Complaint with this Court.

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] Pursuant to 28 U.S.C. §636(c), this case was assigned to the undersigned for final disposition upon consent of the parties (Doc. 23).

**Issues Raised by Plaintiff**

Plaintiff makes the following arguments:

1. The ALJ failed to properly evaluate Plaintiff's residual functional capacity ("RFC").

2. The ALJ erred in evaluating the opinion evidence.

**Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*,

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.

245 F.3d 881, 886 (7th Cir. 2001).

Importantly, this Court's scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). This Court determines whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. She determined that Plaintiff did not engage in substantial gainful activity from her alleged onset date of May 1, 2013 through her date last insured of December 31, 2016 (Tr. 21).

The ALJ found that Plaintiff has severe impairments of "degenerative disc disease of the lumbar spine, degenerative disc disease of the thoracic spine, and chronic lumbosacral pain syndrome" (*Id*.). However, she found that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" *(Id*. at 23).

The ALJ found that Plaintiff has the residual functional capacity to:

> [P]erform sedentary work as defined in 20 CFR 404.1567(a) except she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but never climb ladders, ropes, or scaffolds. She could have occasional exposure to extreme cold, vibration, and hazards, such as unprotected heights and unprotected machinery. She needed a sit/stand option, in that she could stand 15 minutes of every hour while remaining at the workstation and on task. Due to pain and the effects of medication, she could perform work limited to simple, routine, repetitive tasks in a work environment free of fast-paced quota requirements, involving only simple, work-related decisions, and few, if any workplace changes.

(Tr. 23).

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff was unable to perform past relevant work through the date last insured yet concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (Tr. 28).

## The Evidentiary Record

The Court reviewed and considered the entire evidentiary record in formulating this Order. The following summary of the record is tailored to Plaintiff's arguments.

### 1. Evidentiary Hearing

Plaintiff testified that her most recent job was working for the pre-kindergarten program in St. Clair County, Illinois. She explained that, "at the time, I was very crooked. I was already very crooked from the scoliosis." She worked four hours a day, consisting of a morning shift and an afternoon shift; in between, she would go home and lay down (Tr. 43). She stopped working for St. Clair County prior to her November 2013 surgery (Tr. 46). Prior to the pre-kindergarten position, Plaintiff worked for a newspaper as an ad assistant (Tr. 44). She had to leave that job because she could not sit for eight hours a day (Tr. 46). Plaintiff testified that she was "always a hard worker" and she waited a long time to file for disability because she kept hoping her pain would get better (Tr. 58).

Following her November 2013 surgery, she did not drive for approximately three to four months, and then she drove "maybe once every other day" for five minutes at a time (Tr. 50). She went to the store twice a week (Tr. 50, 51). If it was a "big" shopping trip, her husband would go with her.

Plaintiff testified that from May 2013 through December 2016, her pain was always 8 out of 10, even with medication.[4] Most of the pain radiated from her back down her left leg. She could walk for 8-10 minutes at a time (Tr. 53). She could sit for 10 minutes at a time before she needed to lie down. Approximately five times a day, she would need to lie down for thirty minutes (Tr. 54). She used adaptive devices in the shower (e.g., a seat). She could do light cleaning (e.g., wiping off a counter or washing a few dishes). She could not lift more than a gallon of milk or load clothes in and out of the dryer (Tr. 60, 61). Her husband performs most household chores (Tr. 59). While she helped take care of her mother, she did not perform any physical labor (Tr. 55, 56).

To keep herself busy, Plaintiff would read fiction (Tr. 62). She would often have to re-read a paragraph because she had difficulty concentrating (Tr. 62). She and her husband had previously enjoyed going to the movie theatre, but they stopped in 2013 because she could not sit for the length of time to watch a movie (Tr. 68). She could still attend family events, but preferred to have them at her house so she could lie down, if necessary (Tr. 68). Because of her pain, she did not sleep for more than five hours at night (Tr. 64). She had numbness in her hands, legs, and feet (Tr. 67). Plaintiff took medicine for her pain, but the medicine made her nauseous, forgetful,

---

[4] Plaintiff gave most of her testimony in the present tense, even though the ALJ informed her that the relevant period of was May 2013-December 2016. Plaintiff explained that since the 2013 surgery, she has felt the same and experienced the same limitations (Tr. 67).

and sleepy (Tr. 56).

The Vocational Expert ("VE") testified that a person with Plaintiff's RFC could perform the following jobs: 1) ticket-taker; 2) touch-up circuit board worker; 3) optical goods assembler. Those jobs would have zero-tolerance for an individual who needed to take breaks to lie down (Tr. 71). The individual would be allowed less than 10% time to be "off task" (Tr. 72). Plaintiff testified that the medication she was taking would not have allowed her to perform a job like a ticket-taker (Tr. 73).

### 3. Relevant Medical Records

Plaintiff underwent posterior spine fusion surgery at Barnes Jewish Hospital in St. Louis, Missouri on November 13, 2013. In his Operative Report, the surgeon (Dr. Laurence Lenke-Washington University) noted her indications for surgery:

> The patient is a 46-year-old female who is approximately five years out from an anterior posterior fusion at L4-SI. She has done well with that. However, she has had progression of idiopathic scoliosis with degeneration above producing angulation at L2-3 and especially at L3-4, causing progression of her deformity and increasing truncal pain.

(Tr. 325). Following surgery, Plaintiff was transferred to the intensive care unit in stable condition (Tr. 328). She was discharged home six days later. (Tr 314). One month later, she underwent an x-ray of her thoracolumbar spine that showed "no residual scoliosis" (Tr. 406).

Plaintiff saw Dr. Jeffrey Gum at Washington University on March 19, 2014 for a post-op visit. Dr. Gum noted that Plaintiff was four months post surgery, and "[s]he is doing fantastic. She has no complaints. She states she's ambulating well….[s]he states she has weaned herself off of narcotics and is very pleased with her progress at this point." Plaintiff was "pleasant and cooperative throughout the examination." Overall, she had "good balance and posture is

maintained", which was consistent with radiology findings.  Plaintiff and Dr. Gum "discussed the do's and don'ts with regards to spine precautions.  She is very pleased at this point."  She was instructed to return in one year for a follow up visit (Tr. 440).

Plaintiff saw Dr. Lenke on November 14, 2014 for her one-year post-surgery visit.  Dr. Lenke noted that "overall doing very well and is pleased with everything."  He noted that she had a "normal dynamic and static neurological exam in the lower extremities."  X-ray imaging of her thoracolumbar spine showed no changes in her fusion or hardware, and normal thoracolumbar alignment (Tr. 404).  For her treatment plan, he wrote "[s]he looks good and feels quite good, very pleased with everything. We will see her back when she is two years postop" (Tr. 482).

In 2015, Dr. David Rawdon (Plaintiff's primary care physician) referred Plaintiff to a pain management specialist for "scoliosis/prior surgery" (Tr. 480).  There are no concurrent records in the file reflecting that Plaintiff saw Dr. Rawdon in April 2015 and complained of back pain. Plaintiff saw Dr. Rawdon in March 2015 for a cough and chest congestion, but it is unclear from Dr. Rawdon's handwritten notes whether she complained of back pain at that visit (Tr. 493). There are no records in this matter that indicate Plaintiff went to the pain management clinic until June 2017 (Tr. 563).

On January 6, 2016, Plaintiff saw Dr. Mannish Gupta, Chair of Spine Surgery at Washington University-St. Louis.  He noted that Plaintiff was two years postop and "when she sits on the toilet for too long or sits for too long her feet go numb but they get better right away when she gets up. She gets some back pain between her shoulder and low back pain but it is not terrible….She takes care of her mother who is heavy and she has to do some lifting."  Dr. Gupta found that Plaintiff's strength was good in both lower extremities.  She could walk on her heels

and toes, and she could squat and rise without difficulty (Tr. 438).  Overall, she was "doing well postop two years" and would return to see Dr. Gupta in 12 months (Tr. 438).

Dr. Rawdon saw Plaintiff on July 16, 2016 for low back pain (Tr. 684).  He prescribed pain medication and recommended that she follow up with Dr. Gupta.[5]  X-ray imaging of Plaintiff's thoracolumbar spine revealed no changes from x-rays taken in November 2014 (Tr. 686).

   4. **Dr. Rawdon's Opinions**

On January 19, 2016, Plaintiff saw her primary care physician, Dr. Rawdon.  Dr. Rawdon noted the following in Plaintiff's chart:

> She comes in. We discussed her back. She has had spinal fusion. She is seeing a spine/scoliosis physician in St. Louis. She has chronic pain, chronic decreased range of motion. She cannot lift more than two pounds. She cannot do anything more sustained than (sic) hour.
>
> She was seen and examined. She has decreased range of motion. Negative straight leg raising test. Her skin is normal. She is otherwise awake, alert and active, pleasant and cooperative. No other issues noted. Disability _____ work filed. Tylenol and ibuprofen _____ and p.r.n. pain medicines. Physical therapy. Release for Dr. L_____. 40 minutes spent in the office discussing disability and her paper work.

(Tr. 475).  On that same day, Dr. Rawdon completed a "Physical Capacity Questionnaire" in which he noted that Plaintiff could not stand or walk two hours out of an eight-hour workday.  He also noted that she could not sit for six hours out of an eight-hour workday.  He listed her diagnoses as osteoarthritis lumbar spine, scoliosis, and chronic pain syndrome (Tr. 476).  Most of Dr. Rawdon's prior visits with Plaintiff involved handwritten notes and it is unclear whether he made any notes that describe symptoms similar to his January 19, 2016 notes and evaluation (Tr.

---

[5] Dr. Gupta ordered the July 2016 x-ray (Tr. 686). Whether Plaintiff saw Dr. Gupta in July 2016 is unclear from the records, as there is no documentation of an office visit.

486-502).

**5. State agency physicians**

Dr. Julio Pardo and Dr. Yacob Gawo (both state agency physicians) assessed Plaintiff's residual functional capacity. The ALJ found that both physicians' findings were generally consistent with the medical evidence of record and gave some weight to their opinions. Both physicians determined that Plaintiff could sit for "about" six out of eight hours in a normal work day. The ALJ further noted that while he gave weight to Dr. Gawo's and Dr. Pardo's opinions, he would afford Plaintiff every benefit of doubt that she was limited to sedentary work.

## Analysis

A "logical bridge" must connect the evidence and the ALJ's conclusion. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Plaintiff claims that there is no "accurate and logical bridge" between the ALJ's RFC determination that Plaintiff needed a sit/stand option so "she could stand 15 minutes of every hour while remaining at the workstation and on task." Plaintiff's argument is unfounded, as the RFC is consistent with the opinions by Dr. Pardo and Dr. Gawo that Plaintiff could sit for "about" six out of eight hours in a normal workday. Moreover, ALJ Jecklin stated that she gave Plaintiff every benefit of the doubt that she had some pain and needed a sedentary occupation. While Plaintiff alleged that she had even greater limitations, those allegations are not consistent with Plaintiff's treatment history and the spinal surgeons' records that clearly state Plaintiff was "fantastic" and she "looks good and feels good" in the three years following the November 2013 surgery.

Plaintiff also argues that "substantial evidence" shows that "Plaintiff would be off task nine percent of the workday" if she changed positions between sitting, standing, walking, and lying

down." The ALJ explained that while Plaintiff alleged that she needed to change positions more frequently than once an hour, that allegation was not supported by the evidence in the record. Moreover, the ALJ specifically stated that Plaintiff needed a sit/stand desk that would allow her to change positions without losing her concentration and going off task.

Plaintiff further contends that the ALJ should have, at least, considered her disabled in July 2016 when she heard a "pop" from her back. Again, this argument is contradicted by the evidence in the record. The ALJ considered Plaintiff's presentation to Dr. Rawdon on July 19, 2016, but noted that the July 2016 x-ray images were normal and her exam was "essentially normal. (Tr. 25, 684). Plaintiff argues that because she subsequently had surgery in 2017, the ALJ erred by failing to find her disabled in 2016. In March 2017 (after the date Plaintiff was last insured), Plaintiff claims that she heard a "pop"; radiology revealed broken hardware in her back (Tr. 656, 674). She then had surgery (Tr. 586). Despite the normal radiology images in July 2016, Plaintiff appears to be asking the Court to find that the hardware in Plaintiff's back may have broken in 2016. In doing so, Plaintiff is asking the Court to re-weigh the evidence, which is improper.

Next, Plaintiff claims that the ALJ improperly weighed the medical opinion evidence. This argument is also unfounded. The ALJ gave Dr. Rawdon's January 2016 opinions little weight because they were not supported by Plaintiff's other medical records. It is appropriate for the ALJ to consider the "supportability" of a treating medical provider's opinions. 20 C.F.R. § 404.1527(c)(3). The ALJ gave some weight to Dr. Pardo and Dr. Gawo, in light of their familiarity with the program and the consistency of their opinions with the medical records. These factors were appropriately considered. 20 C.F.R. § 404.1527(c)(6). The Court will not

substitute its judgment for that of the ALJ.

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED: March 31, 2021**

s/
**Hon. Reona J. Daly**
**United States Magistrate Judge**